Filed 2/6/14  In re P.W. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re P.W., a Person Coming Under the Juvenile Court Law. | B247824 (Los Angeles County Super. Ct. No. CK93842) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>S.S. et al.,<br><br>        Defendants and Appellants. | |

        APPEALS from an order of the Superior Court of Los Angeles County. Deborah Losnick, Juvenile Court Referee.  Affirmed and remanded with directions.

        Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant S.S.

        Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant P.W., Sr.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and David Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

S.S. (mother) and P.W., Sr., (father) (collectively the parents) appeal the disposition order removing P.W. (minor) from their physical custody based on a lack of substantial evidence that returning the minor to their custody posed a substantial danger of harm.  In the alternative, the parents argue that reversal is required because the Department of Children and Family Services (Department) did not comply with the notice provisions in the Indian Child Welfare Act (ICWA).  We conclude that the disposition order was sufficiently supported by evidence that the minor is a medically fragile child and the parents are unable or unwilling to provide him with the proper care.  However, as conceded by the Department, it did not comply with the ICWA notice provisions.  Though we affirm the disposition order, we remand the case to the juvenile court to ensure compliance with the ICWA.

**FACTS**

**Background; the Referral; the Hospital Hold**

The parents were married on October 7, 2011.  Almost five months later, on February 20, 2012, the minor was born premature and stayed in a neonatal intensive care unit for about a month due to respiratory distress.  When the minor was released, he was placed on an apnea monitor.  He suffered apneic episodes multiple times a day and stopped breathing.  When he was comforted by his parents, the minor's breathing would resume.  He was under the care of a pediatrician, Dr. Tan.

In May 2012, the minor was exposed to cigarette smoke from his maternal grandmother (grandmother).  The next day, his apnea monitor sounded 10 times in less than 12 hours.  The Department received a referral alleging a threat of physical and emotional abuse by father.  As reported, mother and father yelled and hit each other.  Three or four times a week, the reporting party heard banging coming from the family's apartment.  A neighbor disclosed that father slammed the minor into the tub because he did not want to give the minor a bath.

A social worker visited the family and interviewed mother and father.  They denied the existence of domestic violence in the home, though mother conceded that they did occasionally argue.  She disclosed that she received therapy from Pacific Clinic, and

that father and she also go to couple therapy. According to mother, she had postpartum depression but was not on any kind of medication. Father reported that he was a patient at Regional Center, but further stated that he had never been diagnosed with a mental health disorder. He denied slamming the minor in the tub. There was no evidence that the minor had been injured.

On May 18, 2012, the parents took the minor to Antelope Valley Medical Center due to "breath holding spells." He was transferred to Miller's Children's Hospital for a higher level of care.

The minor was diagnosed with acute bronchiolitis, laryngomalcia[1] and feeding problems, which resulted in a failure to thrive. Medical personnel monitored the minor to determine if he needed a gastronomy tube (G-tube) because of his difficulties swallowing. He had severe respiratory distress with episodes of decreased levels of oxygen in the body every five to 10 minutes. He required oxygen at all times, and frequent deep suctioning. A doctor spoke to mother and father regarding the minor's condition and what might need to be done to provide proper care, and nurses attempted to explain the severity of the situation. The parents appeared unable to understand the medical issues and were resistant to treatment, saying that they did not give permission to have the minor treated. They kept threatening to take the minor out of the hospital against medical advice. Mother said that God did not give the minor tubes, so he should not have them. During the next several weeks, the minor's need for oxygen and deep suctioning increased. He received respiratory treatment by a therapist as needed and at varying frequency. As his stay at the hospital continued, feeding problems progressed and he developed a rhinovirus.

On June 4, 2010, mother informed a nurse that she did not want the minor to have a G-tube. She said a G-tube was the "easy way out" and perhaps if the minor received more than 10 minutes of occupational therapy a day, he would be able to eat better. Father told a nurse, "I want AMA (against medical advice)" and "I just want to go

---

[1] The detention report described laryngomalcia as a condition "where [the] upper larynx collapses inward during inhalation, causing airway obstruction."

home." In a Resident Brief Progress Note, Dr. Benjamin A. McDonald wrote: "[The minor's] parents have been intermittently threatening to take the [minor] out of the hospital AMA throughout the day today. I have personally spent at least 2 hours this afternoon in direct communication with the mother and father. [Mother] stressed that she is concerned that placement of a [G-tube] could 'cause my child to die' or to 'get a lot of infections.' She has continued to state that she does not want a [G-tube] placed 'for religious reasons' and 'because only I know what is best for my baby.' She also seems upset that our social worker has been in contact with the [Department] worker who is assigned to their case. Mother is very difficult to redirect. [Mother] asked numerous times that I send them home with oxygen and that she would feed [the minor] at home. I discussed with her at length why I was not comfortable sending [the minor] home while he was on oxygen. . . . I do believe that the [minor] is not safe to leave the hospital while requiring frequent deep suctioning and oxygen. If the mother starts insisting once again on leaving AMA[,] I believe it would be in the [minor's] best interest to be placed on a hospital hold." On the day Dr. McDonald wrote his note, Miller's Children's Hospital put a hold on the minor.

**The Petition; the Detention Hearing; Information About the Parents**

On June 7, 2012, the Department filed a petition pursuant to section 300, subdivision (b) of the Welfare and Institutions Code[2] alleging that the parents could not supervise or protect the minor.

Following a hearing, the juvenile court found a prima facie case for detaining the minor. Mother indicated possible Indian ancestry from the Sioux, Cherokee and Blackfoot tribes, and father indicated possible Indian ancestry from the Blackfoot and Agua tribes. As a result, the juvenile court instructed the Department to evaluate whether the ICWA applied.

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

4

The next day, the Department filed a last minute information for the court indicating that mother and father had both been dependents of the juvenile court,[3] and noting that mother had presented a letter from Dr. Tigran Gevorkian stating: "Due to mental illness, [mother] has limitations regarding social interaction, coping with stress, etc. In order to help alleviate these difficulties, and to enhance her ability to live independently[,] . . . I am prescribing an emotional support animal[.]" The Department was unable to determine the nature of mother's disability, and how it affected her ability to care for the minor.

According to father's regional center case worker, Mia Archie, father's current diagnosis was mild retardation.[4] However, in 2003, he had been diagnosed with posttraumatic stress syndrome and major depression disorder with psychotic features. He was not on any psychotropic or other medication, but he was in an independent living program, which included parent training.

---

[3]     Grandmother received voluntary family maintenance services in 2001 as a result of a referral alleging that her home was unsanitary, and she had bipolar disorder and was expressing suicidal ideation. In 2005, her family came to the attention of the Department based on the same allegations, but it was additionally alleged that grandmother was smoking marijuana and physically abusing mother. Grandmother told a social worker she wanted her children removed because she was so depressed that she wanted to kill herself. Her children were placed with their father, and then later placed in foster care. Mother displayed "defiance and chronic [absences without leave] from placement and she was never able to remain anywhere stable or receive mental health services." Though jurisdiction was terminated, it was later reinstated when grandmother attempted suicide in her home with her children present. Mother continued to leave her placements and did not receive mental health services. According to mother, she was in foster care from age 11 to 17, and the reason she frequently left her foster homes was because she was mistreated by her caregivers. Father was a dependent of the juvenile court from 2001 to 2005. When interviewed, he alleged that he, too, was mistreated in foster care. Both parents expressed a desire to protect the minor from the foster system.

[4]     Father reported that mother also was diagnosed with mild retardation. The interim review report for June 15, 2012, indicates the same. We note that in the appellate briefs, the parties refer to father's diagnosis of mild retardation, but not to mother's diagnosis.

5

**The June 15, 2012, Interim Review Report**

A letter from Birth and Family Services, Inc. was attached to the interim review report signed by a Department investigator named Son'a Williams (DI Williams). The report indicated that father was authorized to receive 60 hours of monthly parenting with living skills instruction and support, mother and father had been asking questions and educating themselves about the minor's needs, and a parent trainer would be present when they visited the minor.

The Department reported that mother and father were receiving SSI benefits due to their mild retardation. Mother was open to receiving mental health services. DI Williams assessed the home where the parents had lived for about a year. It consisted of two bedrooms, one bath, a living room, and a kitchen, and the structure of the home met the Department's requirements.

To explain the parents' resistance to a G-tube, mother informed a social worker during an interview that "all we were trying to do was make the best decision for our kid. I read things on the internet and I saw a couple videos from [YouTube]. There was nothing positive about the [G-tube] procedure. I saw this girl, age 14, she was threatening to kill herself because she did not have a normal life. I want my son to be able to eat a hamburger. I [do] not want him to kill himself because he [cannot] have a hamburger. There was a girl on [YouTube] who stated she wished she never would have [received a G-tube]." Per mother, a doctor said the minor could have G-tube for a day or the rest of his life. Mother was not satisfied with his response and asked that the medical staff contact the minor's primary physician, Dr. Chung. As reported by mother, her request was denied. She expressed concern that the minor would pull out a G-tube and then would either "bleed out" or get an infection. Her preference was for the minor to be discharged from the hospital with oxygen.

A letter from mother was attached to the interim review report. In that letter, she stated, inter alia, that she did not refuse necessary care for the minor. Rather, she wanted a second opinion, and she wanted the minor transferred to Huntington Memorial Hospital in Pasadena. She painted a picture of Miller's Children's Hospital as a place full of

6

"foul" practices, adversarial medical staff and adversarial hospital social workers. According to mother, the hospital social worker made false allegations against the parents to the Department.

Father reported that mother and he were trained on how to use a "breathing machine." He explained to DI Williams that the parents had purchased a video monitor, and then stated that "we just want our son to come home. We are willing to comply with the hospital recommendations."

**Insertion of a G-tube**

Though mother and father were concerned about the scarring that would result from a G-tube, they eventually consented to one being placed. On June 27, 2012, a G-tube was inserted.

**The July 3, 2012, Jurisdiction/Disposition Report**

DI Williams once again interviewed the parents. Father denied threatening to the take the minor out of Miller's Children's Hospital. He said the parents wanted the minor transferred to Children's Hospital Los Angeles because it was more accessible. It took the parents two hours by train to get to Miller's Children's Hospital. In father's perception, the medical staff at Miller's Children's Hospital used the threat of contacting the Department to control the parents' decision making. Just thinking about the situation made him depressed. He did not want to be hospitalized, and he did not want to participate in therapy, but he needed an outlet. Mother said she wanted a second opinion before consenting to a surgical procedure, and she wanted the medical staff to wait two weeks before inserting a G-tube. She complained that the medical staff did not give her accurate information. According to her, the minor passed the Ph poll test, swallow test and bronchial study. Though he did not pass the "OPM" study, she stated, "[I]f he was going to die he would have died already." She believed that the medical staff was mistreating the minor because the suctions were frequently filled with mucous and the minor had a diaper rash. Frequently, she would hear the medical staff giggling in the hallway. Her feelings would be hurt as she watched the minor turn purple from lack of oxygen.

7

In a phone interview, DI Williams spoke to Dr. Stephanie Hertz on July 2, 2012. She had not seen the minor in a week. In Dr. Hertz's opinion, mother and father appeared "very child like." Linda Trabossi-Mathis (Trabossi-Mathis), a nurse practitioner from Miller's Childrens' Hospital, was also interviewed. She stated that the parents were learning to hook up the minor's feeding tubes, disconnect the tubes and flush them. They asked good questions and were able to recall information when asked to demonstrate what they had learned. Mathis consented to the parents coming to the hospital on Saturday, June 30, 2012, and Sunday, July 1, 2012. They were scheduled to complete the minor's feeding on Saturday from 11:30 a.m. to 3:30 p.m. However, they missed the scheduled feedings and did not contact medical staff. At one point, the parents showed up at a shift change to complete a feeding. A nurse was able to complete a mock feeding with the parents, and they performed it well. DI Williams asked the parents why they missed visits. Mother said they were participating in an ILP Program at Para Los Ninos on June 30, 2012. On July 1, 2012, they arrived at a different time than scheduled because they failed to tell the agency worker from Birth & Family Services that they did not have transportation to and from the hospital. They missed a visit on July 2, 2012, due to lack of transportation.

All mother's and father's visits were monitored.

The Department reported that mother was diagnosed with bipolar disorder and was refusing medication. It stated that it "has serious concerns . . . whether or not the [minor] can be safely maintained in the care of mother and father. Mother and father lack insight and do not appear to have the ability to appropriately care for the [minor], as they have frequently disregarded what is in the best interest of the [minor] (mother and father have missed three feedings)."

In its recommendation, the Department urged the juvenile court not to release the minor to the parents' custody. It opined the parents would benefit from reunification services and further supervision.

8

**The Plea of No Contest to Jurisdiction**

On July 3, 2012, mother and father signed waivers of rights and pleaded no contest to the dependency petition. The juvenile court amended the petition to allege: "The [minor] has significant medical issues which require juvenile court intervention to assist parents in caring for [the minor]. [This] situation[,] without court intervention[,] places the [the minor] at risk."

The petition was sustained.

**The Last Two Weeks of July 2012**

In mid-July 2012, DI Williams participated in a treatment meeting at the hospital. The primary concerns were gastro esophageal reflux and laryngospasms that caused the minor to frequently desaturate (drop in oxygen levels). The minor continued to be identified as "high risk." The medical staff reported that mother and father had not demonstrated the ability to care for the minor because they often appeared frustrated and required multiple prompts to address the minor's medical needs. They needed more coaching even though they had received two weeks of support and teaching services to address medical issues, which was far more than other parents received. Medical staff indicated that the minor had medical and physical issues, and expressed concern that the parents would not comply with discharge orders. Because they had transportation problems, medical staff was skeptical that mother and father would be able to transport the minor to and from his numerous medical and occupational therapy appointments. In the view of the medical staff, neither mother nor father showed any initiative. Rather, they had to be prompted by medical staff when the minor had feeding or breathing difficulty.

When they met with medical staff to discuss their progress, mother and father were not receptive to medical staff's comments. Mother complained that medical staff was not communicating with them. The parents claimed that they made mistakes when feeding the minor because they were tired, had not been able to sleep and were being watched by the medical staff.

9

By July 20, 2012, the minor was cleared for release. However, he required a pulsox machine to measure his oxygen and respiration. The machine could not be requested without a placement address. The Department opined that the minor could not be safely placed with the parents because they had not exhibited the ability to provide adequate care.

On July 21, 2012, father did not know the minor's feeding schedule. He had to be reminded to feed the minor at 7:00 a.m. When he poured formula into a feeding bag, he did not close the roller clamp and ports. A nurse prompted father on how to prime the line. When he programmed the pump for 110ccs, the nurse had to tell him that the minor gets 120ccs for day feeds. Mother and father forgot the minor's 10:00 a.m. feeding and had to be reminded. Then, at 1:00 p.m., mother forgot to apply bacitracin to the G-tube site.

At 2:00 a.m. the next day, mother once again had to be reminded to apply bacitracin, and father needed the nurse's instruction all throughout feeding the minor. For the 7:00 a.m. feeding, mother attempted to pour fresh formula into the old formula. The nurse told mother to empty the feed bag and rinse it before pouring the fresh formula into it. Though mother competently performed the feeding, she left the rails down on the crib. Later that morning, mother and father both asked if 24-hour care was over. When the nurse explained that 24-hour care meant around the clock care, not care for one 24-hour period, father raised his voice and demanded to know why the nurse had not explained the process earlier. Mother raised her voice, saying, "[W]e have stuff to do. We go to church and do other things on the weekends." They both appeared frustrated, sighing and rolling their eyes when the nurse explained that the parents needed to be ready to take care of the minor on their own. That night, after administering the minor's medication at 10:00 p.m., mother once again left the rails down on the crib.

A few days later, father changed the minor's diaper and then, without washing his hands, removed the minor's feeding tube. The father walked away from the crib without putting the rail back up.

10

On July 26, 2012, the parents closed the door to the minor's room and nurses did not hear an alarm. A nurse spoke to the them and explained that it was important to leave the door open. They indicated that they had a right to privacy, closed the door and posted a sign citing to a California law pertaining to the right to privacy. They refused to allow a nurse to draw the minor's blood.

The next day, the minor's breathing difficulties escalated. He was no longer cleared to be discharged.

**The August 1, 2012, Disposition Hearings; Intervening Developments**

At the initial disposition, the juvenile court ordered the minor detained in the hospital or shelter care. The hearing was continued.

On August 3, 2012, the minor's medical case worker, social worker William Thomas (SW Thomas) spoke by phone with Dr. Alexis Seegan who stated that the minor was cleared for discharge. She said that the parents were too forceful during feedings, and that they were not following instructions. An occupational therapy student reported that father had not fed the minor in two weeks. Also, she stated that mother knew the steps for feeding the minor but did not execute them without making errors, and without receiving feedback from a third party.

About a week later, the Department reported that mother still required supervision while feeding the minor, and father had not been cleared to do the feedings by himself. Feedings were scheduled every three hours and lasted 30 minutes each, which meant that feedings would have to be monitored all day and all night. Father's Regional Center provider, Birth & Family Services, indicated that it was authorized to provide only 60 hours of parenting support and therefore could not provide 24-hour monitoring. The juvenile court ordered the Department to find a medical placement that would allow the parents to feed the minor on a daily basis. In addition, the Department was ordered to prepare a report addressing how the minor was doing medically, and whether he could be returned to the parents' custody. The minor was placed in a facility called CASA III in the City of Upland, which was 57 miles from the parents' home and difficult for them to visit. A few weeks later, the juvenile court ordered the Department to make all efforts to

11

place the minor closer to the parents' home, and to provide the parents with transportation assistance. The Department was given the discretion to place the minor in a facility closer to the parents, or to release the minor to the parents' custody. The parents were granted unmonitored visitation with a "reasonable visitation schedule."

The Department provided mother and father with transportation funds. However, they did not consistently visit the minor because, they claimed, mother did not feel well and father could not travel without her.

As of August 15, 2012, mother completed the necessary training to feed the minor without difficulty or supervision. Father received training on four dates in September of 2012 but still required supervision during feedings. They completed a 16-hour parenting program.

Both parents were assessed at Kedren Acute Psychiatric Facility. Father did not meet agency criteria for treatment. As for mother, a last minute information for the court indicated that she had been referred to the Coalition of Mental Health Professionals for parenting classes but did not provide proof of following up. An interim review report stated that medical records were silent as to whether mother was referred from mental health services. Medical staff informed a social worker that mother did not have Axis I symptoms and therefore did not meet their criteria. The Department obtained copies of past medical records indicating that mother had been previously diagnosed with Bipolar Disorder, depression and anxiety, had a history of visual and auditory hallucinations, and was hospitalized for psychiatric reasons in 2005. The medical records regarding father revealed that father had previously been diagnosed with chronic posttraumatic stress disorder, impulse control disorder and mood disorder as well as having a history of mild retardation.

At a Team Decision Meeting on September 19, 2012, a safety plan was adopted. In addition, the parents and the Department developed a transitional plan that consisted of eight-hour day visits to the parents' home on Saturdays and Sundays. The Department recognized that "mother and father have made great efforts to address the [minor's] medical condition." But Department concluded that the parents had "not demonstrated

12

the capacity to provide ongoing sufficient care to the child, as required by medical professionals." Per the plan, grandmother would facilitate the minor's transportation.

**The September 27, 2012, Disposition Hearing**

At the continued disposition hearing DI Williams testified that though she did not know the current plan for the minor because that was handled by a service worker, the Department was concerned that the parents would not be able to feed and care for the minor on a continual basis. She testified that the parents completed a CPR and first aid class as well as a parenting class, and they had a sleep apnea monitor in their home. Counsel informed the juvenile court that the transitional plan developed at the Team Decision Meeting was not implemented because grandmother was not providing assistance. The juvenile court ordered unmonitored visits with both parents together until the next hearing.

**The New Placement; Further Disposition Hearings; Intervening Developments**

On October 2, 2012, the minor was moved to a medical facility in the City of La Puente called GE Pediatrics. The parents were given a monthly bus pass by the Department so that they could visit the minor. Also, if they called in advance, they could utilize the Access Paratransit program. SW Thomas spoke by phone with parent trainer Helen Dominguez (PT Dominguez) who confirmed that she was continuing to work with father. He asked for his services to be reassigned, but PT Dominguez said father had made the request when he was upset. She was approved to work with father for 40 hours per month. James Moore, father's assigned social worker from Regional Center, informed SW Thomas that father's support hours could be increased when the minor returned home.

When the parties reconvened for the disposition hearing on October 10, 2012, mother testified, inter alia, that the minor had been diagnosed with Charge syndrome (which is accompanied by various symptoms) and Laryngospasms. She completed medical training regarding feeding and administering medication. The family was working with Para Los Ninos, a youth development service, as well as Birth and Family Services, the Nurse Partnership Program and other programs. She did not have a cell

13

phone or a landline but expected to activate a new cell phone after the hearing. The juvenile court ordered the parents to have unsupervised weekend visits.

During the weekend visit from October 12, 2012, to October 14, 2012, the parents failed to give the minor his medication as directed. When he was returned to GE Pediatrics, his heart rate was fast and his apnea monitor went off three times. He had to be watched all night. For the weekend visit of October 19, 2012, to October 21, 2012, the parents were supposed to return the minor at 6:00 p.m. the final night so he could receive his 6:00 p.m. medication. The parents did not return the minor to GE Pediatrics until 8:50 p.m.

On October 24, 2012, at a continued disposition hearing, the juvenile court ordered that visitation to be increased to four days per visit for a trial period of two weekends.

**The Events of November 2012**

During a visit in early November, the parents took the minor to Huntington Memorial Hospital. The medical staff told mother that minor had a cold and to bulb suction his nose. Later, when his apnea monitor kept going off, the parents took the minor to Children's Hospital Los Angeles where he was admitted for what turned out to be an extended stay.

When SW Thomas spoke to the attending doctor, Dr. Lily, she expressed a multitude of concerns about the parents, including the following: they were not happy with the G-tube; mother threatened to remove the G-tube; mother had not been forthcoming about the minor; the parents continually reported that the medical staff failed to communicate with them regarding the minor's care; the parents videotaped medical personnel without their consent; mother was unwilling or unable to utilize nursing staff to resolve care issues and instead repeatedly had the attending doctor paged to address concerns; the parents were argumentative regarding the minor's care; and the parents failed to provide accurate dates for the minor's previous treatment. At one point, the medical staff clamped the G-tube. When Dr. Lily checked later, the clamps had been removed. Both the parents and the medical staff denied removing the clamps. According

14

to the attending doctor, the parents falsely reported that the minor had diarrhea and was vomiting. Though mother had been told that only nurses were supposed to feed the minor, mother fed the minor anyway. Then she falsely told nurses she fed the minor one ounce of formula instead of six ounces. That may have resulted in overfeeding. Because they demanded so much attention, the attending doctor had not been able to attend to other patients. Dr. Lily viewed the parents as adversarial to the hospital, and did not want to leave them alone with the minor.

On November 8, 2012, the department filed an ex parte application under section 385 requesting that all visitation be monitored, and that the minor be placed in foster care after discharge from the hospital. The juvenile court granted the ex parte application. It appointed Michael P. Ward, Ph.D. to conduct psychological examinations of the parents.

When a social worker from GE Pediatrics went to pick up the minor for discharge, his apnea monitor was missing. The social worker believed that the parents took it. The minor's social worker inquired with the parents. They denied taking the apnea monitor.

The parents frequently had nonworking telephone numbers. Dr. Ward was initially unable to contact the parents to set up examinations.

**The Parents' 72-Hour Psychiatric Holds**

For reasons that are not clear, mother and father were placed on psychiatric holds from December 17, 2012, to December 20, 2012. Due to these holds, they missed a family preservation meeting. Father was discharged with medication. When SW Thomas asked the parents about their psychiatric holds, they claimed that they did not have any memory of them. Mother said she was hospitalized for anemia and asthma, and that father was with her.

**The Parents' January 5, 2013, Psychological Examination**

Dr. Ward examined the parents and concluded that though they had "problems, limitations and deficiencies," they "clearly have the capacity . . . will and motivation to adequately raise a child." He stated that "the people I saw in my office appeared to be fairly stable, reasonable, and quite workable. So unless there are some clear data that they are a risk or danger to their child and/or unless the child's medical condition and

15

resulting needs are clearly beyond their capabilities to adequately care for him, then I would suggest [that minor and parents] need and deserve a chance at reunification. Of course, it should be done with all the care, caution and supervision necessary, and they need support to understand that. But it is perhaps time for them and the system to work together towards and agreed upon goal."

**The Minor's January 24, 2013, Hospitalization**

The minor was taken to Childrens' Hospital Los Angeles on January 24, 2013, due to a brief period of Cynosis (blue lips). He was admitted because of respiratory distress. To assist with breathing, the minor was placed on a Bi-Pap machine. On February 6, 2013, the Department reported that the minor continued to be medically fragile and have medical complications. There was a possibility that he would need a tracheotomy, which would dictate a higher level of care. The parents visited the minor only one time when he was in the hospital.

**Multiple Disposition Hearings in February 2013**

The juvenile court held a continued disposition hearing over the course of multiple days and heard additional testimony. SW Thomas testified that at the time of the hearing, the minor was hospitalized. His current medical conditions were "Charge association, chronic lung disease, laryngomalacia." He no longer needed a G-tube for feedings or to receive medication. But once he was discharged, he would continue to need the Bi-Pap machine. According to SW Thomas, mother and father still denied their psychiatric hospitalizations. When SW Thomas asked them to sign medical releases, father refused, and mother said she would "think about it." SW Thomas did not know what the minor's discharge instructions would be.

Case worker Lorena Hernandez (CW Hernandez) from Quality of Life Services testified that her agency provided the parents with parenting skills and assisted them during five or six visitations with the minor. According to CW Hernandez, the parents were "hands on" during visits and they complied with the rules of the medical placement. She described their willingness to work with her as "very compliant." The parents notified her of their 72-hour psychiatric holds. She knew that they did not inform SW

16

Thomas, and that caused her concern. The program director of Quality of Life Services, Lisa Fulton (Fulton) testified that the parents told her that they had been informed by SW Thomas that they need to get "another psyche eval," so they went to the hospital because that was the best means for them to comply. Fulton knew that the parents were not comfortable sharing it with SW Thomas because of trust issues. They believed that anything they said to SW Thomas was typically twisted and manipulated. Mother told Fulton that the parents were hospitalized because some of mother's behaviors were misconstrued. Fulton was asked if mother ever disclosed that she had scheduled a psychological examination through the juvenile court system with Dr. Ward. Fulton replied: "I don't believe she did." She was not aware that Dr. Ward actually did an examination. If the juvenile court returned the minor to the parents' custody, Fulton said she "would do an addendum for additional parenting hours" even if that meant "around the clock services[.]"

Abby Arguilla, an employee at GE Pediatrics, testified that the minor was discharged from the hospital after a three week stay. She said that the parents needed training on the Bi-Pap machine. They also needed training on how to feed the minor by mouth.

Mother testified that she was placed on a psychiatric hold after she went to the hospital because she was "stressed" and asked for a psychiatric evaluation. She told the medical staff that she did not feel good. She did not tell SW Thomas because she did not think it had anything to do with the minor's care, and because she did not trust him. According to mother, SW Thomas had changed statements in the Departments reports "to go against me." Mother conceded that she did not sign a medical release for the minor's social worker. Initially, mother said she had not been trained on a Bi-Pap machine. Later, she said that both father and she received training for 10 or 20 minutes from someone at GE Pediatrics, but that person and not sign a confirmation for the social worker.

After hearing argument, the juvenile court stated, inter alia: "The court has considered the reports from July 3rd, 2012, through and including the September 27,

17

2012, report. I reviewed Dr. Ward's report of January 2013. What concerns me is that, as [the Department's attorney] indicated, the parents were not forthcoming to [SW Thomas]. . . . The problem with that is that then the information does not filter to the court. The court has to make . . . decisions based on all of the information that is presented to it. If the information is flawed, the court cannot make an intelligent or appropriate decision. [¶] Notwithstanding the parents' perhaps valid distrust of [SW Thomas] or all of the system, they weren't forthcoming with Ms. Fulton either, and that's where is causes me greater concern. The mother indicated that she and the father were not trained on the [Bi-Pap] machine. Then she indicated a little bit later in the testimony today that she was. . . . [¶] The problem with the trust issue is that it caused a significant misrepresentation. The parents went to a psychiatric hospital and were not allowed to leave on their own accord, and I still [do] not know exactly why they were there. [¶] I still do not know what their exact mental functioning is as a result of the hospitalization. We are not talking about a developmentally normal child in this case. I have a very fragile, special needs child, and the court has to take that into consideration as well. [¶] As a result, . . . [¶] . . . I am declaring [the minor] to be a dependent child of the court under section 300(b) only. [¶] By clear and convincing evidence, his care, custody, and control is taken from the parents and committed to the care, custody, and control of the [Department]. [¶] I am ordering reunification services for both parents. [¶] I am ordering both parents to finish a parent education class. . . ." Next, the juvenile court ordered the parents go to individual counseling to address the case issues and to be evaluated by a psychiatrist to see if they need medication. The parents were granted "ongoing monitored visits." The juvenile court ordered them to sign "HIPPA medical release forms."

These timely appeals followed.

18

## DISCUSSION

### I. Removal of the Minor.

"A dependent child may not be taken from the physical custody of his . . . parents . . . , unless the juvenile court finds clear and convincing evidence" that, inter alia, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) Express and implied findings at dispositional hearings are reviewed under the substantial evidence test. (*In re H.E.* (2008) 169 Cal.App.4th 710, 723–725; *In re T.V.* (2013) 217 Cal.App.4th 126, 136–137; *In re Joshua R.* (2002) 104 Cal.App.4th 1020, 1026.)

According to the parents, the record lacks substantial evidence to support the juvenile court's order of removal.[5] We disagree.

"A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136 (*Diamond H.*), disapproved on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 749, fn. 6; § 361, subd. (c)(1) [removal is authorized if there is or "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody"].)

There is no dispute by the parties that the minor has chronic lung disease as well as other medical problems, and that he needs to receive specialized care by willing, able

---

[5] The parents joined each other's arguments.

19

and well-informed adults. At the disposition hearing, the juvenile court did not expressly find that there was a substantial danger to the minor's well-being if he was not removed from the parents' custody. However, there was an implied finding that the parents could not provide the minor with proper care.

The record establishes a pattern of the parents missing feedings and visits, making mistakes while caring for the minor, resisting medical advice, obstructing medical staff, failing to provide medical staff with accurate information, withholding information from social workers, and generally failing to accept or comprehend that their behaviors were placing the minor at risk. We note that the parents had a conflict at Miller's Children's Hospital as well as Children's Hospital Los Angeles, and, among others, Dr. McDonald, Dr. Seegan, Dr. Hertz and Dr. Lily had difficulty communicating with the parents and thought they posed a danger to the minor. Beyond that, the parents never demonstrated that they could adequately care for the minor by themselves for an extended period of time. Indeed, their visits kept changing from unmonitored to monitored and back again. Though they received training on many occasions, and though they had support services, they never achieved a level of reliability with respect to caring for the minor that made medical personnel comfortable. And at the time of the disposition hearings in February 2013, they still needed approved training on the Bi-Pap machine even if they had 10 or 20 minutes of unsanctioned training. Moreover, by refusing to sign medical waivers, the parents deprived the Department and juvenile court of information necessary for them to determine whether the parents were emotionally and mentally stable enough to properly care for and supervise the minor.

As a result of the foregoing, we conclude that there is sufficient evidence of a substantial danger of harm to the minor unless the juvenile court removed him from the parents' custody. Furthermore, the evidence showed that the parents could not care for the minor without supervision. Even thought Fulton testified that her agency would provide around the clock service, she did not say that her agency would place someone in the parents' home 24-hours a day, seven days a week. Thus, juvenile court had no reasonable alternative to removal.

20

We turn to the parents' arguments.

In large part, the parents attempt to reargue the facts and focus on evidence favorable to their position. We remind them that when a reviewing court engages in substantial evidence review, it will look to the entire record, and it will not limit its appraisal to isolated bits of evidence selected by the appellants. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.) "*If . . . substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*." (*Id*. at p. 874.) To the extent the parents tacitly ask us to fill the shoes of the trier of fact, we decline because that is not our role. Simply put, our role is review the record for error. We have therefore bypassed any argument presented by the parents that is akin to a closing argument, and have instead focused on their claims of error.

The parents contend that the juvenile court could not have determined the risk to the minor if he was returned to their custody because the minor's discharge instructions were unknown at the time of the disposition hearing. In other words, the parents question how the juvenile court could impliedly find that they were incapable of providing care when there was no evidence of what care would be necessary when the minor was discharged from the hospital. But the minor was still diagnosed with Charge association, chronic lung disease and laryngomalacia, and he was going to need a Bi-Pap machine when he was released. This evidence was sufficient to establish that the minor remained a medically fragile child, and that his caretakers would have to be well-versed in attending to all his needs. Based on the parents' difficulties in the case, there was a reasonably deducible inference that they had not yet taken all the steps necessary to provide the minor with reliable care.

Citing *In re James R.* (2009) 176 Cal.App.4th 129 (*James R.*), the parents argue that the risk of harm is too speculative to support removal. *James R.* is distinguishable because the children in that case did not have special needs, and there was no evidence that the mother's mental illness or substance abuse placed her children at substantial risk of physical harm. The children came to a social worker's attention when the mother had

21

a negative reaction to taking ibuprofen and drinking beer. Although she had a history of mental instability, she had not abused or neglected her children, and there was no evidence she was a danger to herself or others. The social worker merely speculated that if the mother did not follow through with treatment, she might want to hurt herself and expose the children to her suicide attempt. The court pointed out that "[p]erceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence. [Citation.]" (*Id*. at p. 137.) There was no evidence the mother used illegal substances after the children were born, nor was their evidence that the mother was regularly intoxicated, rendering her incapable of providing regular care for her children, or posing a risk to them. Regarding this last point, the court stated that the "mere possibility of alcohol abuse, coupled with the absence of causation, is insufficient to support a finding the [children] are at risk of harm within the meaning of section 300, subdivision (b)." (*James R.*, *supra*, at p. 137.) On top of these observations, the court highlighted that, per the undisputed evidence, the children's father was able to protect and supervise them. (*Ibid*.) Here, the juvenile court's implied findings are not speculative because the parents' history of making mistakes while providing care, forgetting what they had been trained to do, missing feedings and resisting medical advice was well documented. Moreover, there was a consensus among medical staff that the parents posed a risk to the minor.

The parents argue that nothing they did caused the minor to suffer any ill effects from being neglected, and therefore removal is unwarranted. They rely on *In re Paul E.* (1995) 39 Cal.App.4th 996, 1005 (*Paul E.*), which held that "chronic messiness by itself and apart from any unsanitary conditions or resulting illness or accident, is just not *clear and convincing* evidence of a substantial risk of harm. [Citation.]" *Paul E.* is not on point for several reasons. The present case is not about a messy household, it is about the parents' ability to care for a child with special medical needs. Beyond that, the record reveals that the minor has suffered ill effects from the parents' behavior. A day after they allowed the minor to be exposed to grandmother's smoking, his apnea monitor went off 10 times in less than 12 hours. Inferentially, the parents' neglect caused the minor to

suffer more respiratory distress than was his norm. On October 14, 2012, the parents failed to give the minor his medication as directed. When he was returned to GE Pediatrics, his apnea monitor went off three times and he had to be watched all night. Again, the inference is that the parents' conduct led to the minor suffering an unnecessary bout of respiratory distress.

As a corollary, the parents imply that the juvenile court should have concluded that the minor was never injured or at risk due to neglect because Dr. Ward wrote: ". . . [W]hatever concerns there may be and/or have been about [the parents'] ability to care of [the minor] and his medical condition once he was in the hospital, I am not aware of any data whatsoever to suggest that they ever abused or neglected him before he came into the system." The problem with this argument is that Dr. Ward's statement pertains to the time period before the minor entered the dependency system. More importantly, the juvenile court was the trier of fact, not Dr. Ward. Even Dr. Ward acknowledged as much, stating: "Obviously, if these parents actually threatened and/or intended to remove their son's [G-tube], that is a very negative factor, and it would cause great concern about them. However, those are matters of fact and for the Court to decide after looking at all the evidence." As we have indicated, the record establishes instances of neglect. Beyond that, we note that the weight of Dr. Ward's assessment is lessened because, as he himself acknowledged, he did not have all the pertinent medical records. Also, because of the parents' attitudes and characteristics, Dr. Ward found it "difficult to fully evaluate them." Elsewhere, he wrote that "while they both appear to have some emotional type problems, especially the mother, a clear and precise diagnosis is not possible on the basis of the present limited data." Dr. Ward opined that mother should probably have a "psychiatric consultation to see if some type of medication might be helpful[.]" Finally, it must be iterated that Dr. Ward's conclusion was only that the parents "deserve a chance at reunification," not that they should have immediate custody.

The parents point out that a juvenile court cannot remove a child because a doctor opines that a parent is narcissistic (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 527) or because a social worker believes that a parent had not sufficiently internalized parenting

23

skills (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 289). The suggestion is that the evidence supporting dependency was no more than bald opinions about the sufficiency of the parents' parenting abilities. That is not true. The record reveals that the parents are unable or unwilling to consistently and reliably provide minor with the care that has been prescribed by his doctors.

Moving on, the parents press us to conclude that mother did not lie about receiving training on the Bi-Pap machine. This issue is a red herring. The juvenile court expressed confusion over mother's testimony but did not find that she lied. And, in any event, removal was supported by evidence that the parents were not able or willing to provide adequate care for the minor. Regarding the parents' mental functioning, the parents suggest that the juvenile court should have accepted Dr. Ward's assessment. This is flawed because the juvenile court was not provided with records from the psychiatric hospitals where the parents stayed in December 2012, they had histories of psychiatric problems, they had not been forthcoming about their most recent hospitalizations, and they had not been evaluated by a psychiatrist. And even if the juvenile court had accepted Dr. Ward's assessment, that would not erase the plethora of concerns arising from the parents' difficulties providing care.

On a purely legal plane, the parents argue that a child can be removed from his parents' custody only in extreme cases of parental abuse or neglect, and this case does not involve either. But section 361, subdivision (c)(1) authorizes removal without specifying the source of the danger. As provided in *Diamond H.*, that danger can be a parents' inability to provide care. We therefore decline to accept the parents' argument that removal is authorized only on narrow grounds specifically delineated by statute or case law. The statutory language is broad so that dependent children will be protected when a situation demands it. Here, whether it is classified as neglect or something else, the removal order was supported by sufficient evidence of the parents' inability or unwillingness to provide reliable care.

All other issues are moot.

24

## II.  The ICWA.

The parents contend that the Department failed to comply with its notice duties under the ICWA.  The Department concedes.

We follow the rule that when there is a failure to follow the ICWA procedures before disposition, all jurisdictional and dispositional orders remain in effect and the matter is remanded "for the Department to comply with the notice requirements of the ICWA, with directions to the juvenile court depending on the outcome of such notice.  If, after proper notice is given under the ICWA, [the child] is determined not to be an Indian child and the ICWA does not apply, prior defective notice becomes harmless error. . . .  Alternatively, after proper notice under the ICWA, if [the child] is determined to be an Indian child and the ICWA applies to these proceedings, [a party] can then petition the juvenile court to invalidate orders" that violate the ICWA.  (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 385; 25 U.S.C. § 1914.)

## DISPOSITION

The disposition order is affirmed. Upon remand, the juvenile court shall order the Department to comply with the inquiry and notice provisions of the ICWA. If, after proper notice is given, the juvenile court determines that the minor is an Indian child and the ICWA applies, the minor or his parents may petition the juvenile court to invalidate the orders that violated the ICWA.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, Acting P. J.
        ASHMANN-GERST


We concur:


_____, J.
     CHAVEZ


_____, J.[*]
     FERNS

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26